# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | Case No. 09-02782-TLM |
| ROBERT RYAN COX, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| IN RE | ) | |
| | ) | Case No. 09-02907-TLM |
| GREGORY K. RICHARDSON and | ) | |
| HEATHER N. RICHARDSON, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| BRIAN DEPUE and SHARON | ) | |
| DEPUE, husband and wife; and | ) | |
| BRIAN DEPUE as the personal | ) | |
| representative of the estate of | ) | |
| KENNETH DEPUE, | ) | |
| | ) | |
| Plaintiffs/Counter Defendants, | ) | |
| | ) | |
| v. | ) | Adv. No. 09-06092-TLM |
| | ) | |
| ROBERT RYAN COX, | ) | |
| | ) | |
| Defendant/Counter Claimant. | ) | |
| _____ | ) | |
| | ) | |
| BRIAN DEPUE and SHARON | ) | |
| DEPUE, husband and wife; and | ) | |
| BRIAN DEPUE as the personal | ) | |
| representative of the estate of | ) | |

MEMORANDUM OF DECISION - 1

| | | |
|---|---|---|
| **KENNETH DEPUE,** | ) | |
| | ) | |
| **Plaintiffs/Counter Defendants,** | ) | |
| | ) | |
| **v.** | ) | **Adv. No. 09-06093-TLM** |
| | ) | |
| **GREGORY K. RICHARDSON, and** | ) | |
| **HEATHER N. RICHARDSON,** | ) | |
| | ) | |
| **Defendants/Counter Claimants** | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION
_____

## INTRODUCTION

Brian and Sharon Depue, and Brian Depue as the personal representative of

the estate of his brother, Kenneth Depue, ("Plaintiffs") brought these adversary

proceedings against chapter 7[1] debtor Robert Ryan Cox ("Cox") and against

chapter 7 debtors Gregory K. Richardson ("Richardson") and Heather Richardson

("Heather").[2]

Cox filed a voluntary chapter 7 petition on September 11, 2009,

commencing his case.  Richardson and his wife filed a voluntary joint chapter 7

petition on September 23, 2009, commencing their case.  In each case, a deadline

was set for § 523(c) and § 727(a) complaints.  Plaintiffs timely filed such

_____

[1]  All statutory references and citations to chapters, sections and otherwise are to the
Bankruptcy Code, Title 11, U.S. Code §§ 101-1539, unless otherwise indicated.

[2]  Mrs. Richardson's first name is used for clarity, and no disrespect is intended.  The
reasons for separately identifying her will become apparent.

MEMORANDUM OF DECISION - 2

complaints on December 4, 2009.  The original complaints were later amended.

Plaintiffs' Amended Complaints raise issues under § 523(a)(2)(A),
§ 523(a)(2)(B), § 523(a)(4), and § 523(a)(6) as to dischargeability of debts to
Plaintiffs, and further allege causes under several subsections of § 727(a) seeking
to deny the discharges of all Debtor Defendants.  Cox and the Richardsons raised
and asserted counterclaims against Plaintiffs in each adversary proceeding,
seeking recovery on the basis of fraud and defamation (the "Counterclaims").

The underlying disputes have much in common, and the Court ordered the
two adversary proceedings jointly tried.  *See* Fed. R. Civ. P. 42(a) (incorporated
by Fed. R. Bankr. P. 7042).  That trial occurred on July 26, 27 and 28, 2011.  All
matters were taken under advisement at the close of post-trial briefing on
September 15, 2011.  This Decision constitutes the Court's findings of fact and
conclusions of law in each adversary proceeding.  Fed. R. Bankr. P. 7052.[3]

**FACTS**

Design Air, Inc., an Idaho corporation, was owned and managed by Brian
and Ken Depue.  It provided heating, ventilation and air conditioning (HVAC)
services and equipment.  It was formed in the late 1990's, and had prospered.  The
Depues also owned K&B Properties, which owned and leased to Design Air the

---

[3] Given the nature of the allegations, trial and determination by the Court, one
consolidated Decision addresses all matters.  However, for integrity of the record, this Decision is
entered in each adversary proceeding.

MEMORANDUM OF DECISION - 3

real property where Design Air conducted its business.

Richardson was employed with Design Air in 2004. The Depues had approached him about working for Design Air, and soon after indicated to him that they were looking to "get out of the business." Richardson worked on the residential side of Design Air's business, in sales and supervising employees. In early 2006, Richardson was made a "manager" for the company in order to "supervise and manage all aspects of the corporation[.]" Ex. 100.

Cox joined Design Air in 2003 as an installer. He learned to bid and supervise jobs and, in 2005, was named as a "supervisor" on the commercial side of Design Air's business.

In 2006, the Depues initiated discussions with Cox and Richardson regarding their possible purchase of Design Air. Plaintiffs caused valuation analyses to be prepared by their accountant, Troy Peltzer, to support possible purchase prices. For their part, Cox and Richardson made a series of proposals, some including acquisition of the land (owned by K&B Properties) and some not.

The discussions ultimately resulted in a Stock Redemption Agreement dated December 28, 2006. Ex. 218 (the "Agreement"). The parties to the Agreement were Plaintiffs, Cox, Richardson, and Design Air itself. The format of the Agreement was unusual, and requires explanation.

Under the Agreement, the stock ownership of Brian and Sharon Depue

MEMORANDUM OF DECISION - 4

(496 shares) and of Kenneth Depue (494 shares)[4] would be "redeemed" by Design Air effective January 1, 2007, for a payment of $275,000 plus interest at 5.6% per annum to each.  Design Air was required to pay those amounts to Plaintiffs in monthly installments of $4,583.34 each starting February 1, 2007.  The balance of the obligations were due December 1, 2011.  Cox and Richardson guaranteed Design Air's performance of this redemption payment obligation, and Design Air's other obligations under the Agreement.  *Id.* at 2-3.

The shares of stock in Design Air that were being redeemed were "endorsed" and then "surrendered" by Plaintiffs, and the shares were deposited into an escrow account at a title company.  The Design Air payments under the Agreement also went to the same title company and were then disbursed to Plaintiffs.  The title company was instructed that, upon final payment, it was "to deliver to the Corporation [Design Air]" the stock certificates.  The escrow fees were to be paid equally by Brian Depue, Ken Depue and Design Air.  *Id.* at 3-4.

The Agreement also stated that Plaintiffs "retained" a "security interest" in the shares of stock.

In the Agreement, Plaintiffs Brian and Ken Depue "tender their resignations as directors and officers of [Design Air]" effective upon execution of

---

[4]  The 990 shares evidently represented 100% of the outstanding, issued shares in the corporation.  Nothing suggests the existence of other shareholders.

MEMORANDUM OF DECISION - 5

the Agreement (*i.e.*, December 28, 2006). Oddly, though, it also provided that

these resignations "shall be presented to the Board of Directors" of Design Air.[5]

Brian and Ken Depue also resigned as "employees" of Design Air; that resignation

was effective January 1, 2007.

Design Air also agreed, in addition to the $275,000 payment to Brian and

Sharon, and the like payment to Ken, to "hold [Plaintiffs] harmless" for a

commercial loan of $74,464.69 and a line of credit of $300,094.50 that Design Air

had with U.S. Bank.

Thus, the corporation, Design Air, had the obligation to make payments to

Plaintiffs. The Agreement provided for remedies in the event of default in the

performance of these obligations. Plaintiffs could give, at their election, notice of

default to Design Air and, unless the corporation cured those defaults in 30 days,

Plaintiffs could declare the "forfeiture" of the Agreement. "In that event,

[Plaintiffs] shall be released from any and all obligation to convey said stock to the

Corporation and all monies paid by the Corporation [under the Agreement] shall

be forfeited unto [Plaintiffs] as agreed and specified liquidated damages[.] Then

---

[5]   Under Idaho law, directors are elected by shareholders. The Agreement indicated Cox
and Richardson were to become officers. It said nothing about who would be the corporate
directors, much less address proper election of such directors by shareholders once the common
stock was redeemed or surrendered. *See* Idaho Code § 30-1-728(1) ("Unless otherwise provided
in the articles of incorporation, directors are elected by a plurality of the votes cast by the shares
entitled to vote in the election at a meeting at which a quorum is present.").

MEMORANDUM OF DECISION - 6

all rights of the Corporation to purchase said stock[6] shall terminate and be at an end."

In addition to Design Air's responsibilities, the Agreement provided for certain obligations to be performed by Plaintiffs.  Plaintiffs agreed that:

1.  They would not change any accounts or licenses.

2.  They would return their company phones and credit cards to Design Air.[7]

3.  Cox and Richardson would be entitled to manage the business of Design Air and to "have control" of corporate books.

4.  Neither Plaintiff would seek to remove from the corporation's business premises any personal property, nor "disturb any of the licenses" of Design Air.

5.  Subsequent purchases in the name of the corporation would be approved by either Cox or Richardson.

Ex. 218 at 6.

Though all these rights and responsibilities were by and between Design Air and Plaintiffs, the Agreement also placed certain obligations on Cox and Richardson.  It provided that "Cox and Richardson may begin changing the

---

[6]  That the corporation was "purchasing" the stock appears to be used as a synonym for "redeeming" the stock.

[7]  A later provision in the Agreement indicated Plaintiffs could keep their employer-paid and -provided cell phones.  They were going to try to transfer those numbers to another business they owned and operated, called Snake River Fireplaces, Inc.  Ex. 218 at 7.

MEMORANDUM OF DECISION - 7

accounts and licenses into their names" and that this process "will be completed

no later than December 31, 2007."  It further required that "Cox and Richardson,

except for the U.S. Bank personal guarantee, will see that [Plaintiffs'] are released

within 60 days from the date of this Agreement from personal liability including

any personal guarantees on all of [Design Air's] accounts and licenses.  Cox and

Richardson will also see that no later than May 1, 2008, [Plaintiffs] are released

from personal liability on the personal guarantees that were given to U.S. Bank."

*Id.* at 7.

In addition, there were complicated provisions related to responsibilities of

Plaintiffs for certain tax liabilities, and of Design Air and Cox and Richardson for

others.  Plaintiffs, Design Air, Cox and Richardson all agreed to covenants not to

compete.

Cox and Richardson also agreed to "absolutely personally guarantee

payment of the sums to [Plaintiffs] and the performance of all of the other terms

and conditions of this Agreement.  This personal guarantee is in addition to any

other security [Plaintiffs] have."  *Id.* at 9-10.

Upon execution of the Agreement, Plaintiffs resigned their corporate

offices.[8]  Cox and Richardson became Design Air's president and secretary.

---

[8]  Plaintiffs, Cox and Richardson signed a corporate resolution, effective January 1, 2007, stating that Cox was the president of Design Air and Richardson was the secretary, and that the Plaintiffs were resigning their positions in the corporation "as per the stock redemption

(continued...)

MEMORANDUM OF DECISION - 8

However, the evidence is less than clear as to the transfer of corporate ownership.

The Agreement required the "surrender" of the stock certificates – after "endorsement" by Plaintiffs – not to Cox and Richardson, but rather to Design Air. The endorsed stock was held in escrow. The intent appeared to be that the stock would be transferred ("redeemed") upon completion of the payment terms under the Agreement, and that such transfer would be "to the Corporation" – *i.e.*, to Design Air itself. *Id.* at 3-4. This indicates that Plaintiffs remained, on the corporate records, the owners – indeed the sole owners – of Design Air. Nothing suggests that Cox and Richardson became, upon execution of the Agreement or later on completion of payment, the owners of *this* stock in Design Air. *Id.* at 1-3 (providing that the stock of Plaintiffs would be "redeemed" and even suggesting tax treatment). The Agreement appears to contemplate that, if the required payments to Plaintiffs were made, Plaintiffs' stock would be retired.[9] Conversely, if payments to Plaintiffs were not completed, the stock would be released from escrow back to Plaintiffs.[10]

---

[8] (...continued)
agreement." Ex. 105. *See also* Ex. 218 at 4 (Agreement stating resignation as of December 28, 2006, except for employment).

[9]  If a corporation acquires its own stock, those shares constitute authorized but unissued shares and the corporation has the authority to use, hold, acquire, or cancel and dispose of them. *See* I.C. § 30-1-631.

[10]  The Agreement also purported to give Plaintiffs a "security interest" in the stock held in escrow.

MEMORANDUM OF DECISION - 9

Presumptively new stock would (at some point) be issued to Cox and Richardson.  There is no evidence the corporation ever issued new or other stock to Cox and Richardson.  In short, after December 28, 2006, it appears to this Court that Plaintiffs owned the corporation and Cox and Richardson were running it pursuant to the terms of the Agreement.[11]

This result, however, was not what a state court concluded in litigation between the parties.  The District Court for the Third Judicial District, Canyon County, Idaho, held on January 12, 2010, that "on or after December 28, 2006, the Depues were no longer shareholders in Design Air, Inc." and that "on or after December 28, 2006, . . . Cox and Richardson were and are the holders of the shares of common stock in Design Air, Inc."  Ex. 117 at 4.[12]

---

[11]  Alternatively, perhaps **no one** owned the equity of the corporation, since Cox and Richardson were issued no stock, and Plaintiffs had endorsed and surrendered theirs into escrow. However, such an approach would violate the requirements of I.C. § 30-1-603 which restricts a corporation's ability to reacquire stock such that "[a]t all times . . . shares of the corporation are outstanding, one (1) or more shares that together have unlimited voting rights and one (1) or more shares that together are entitled to receive the net assets of the corporation upon dissolution must be outstanding."

[12]  In June 2009, in prebankruptcy litigation over breach of the Agreement, the state court entered an order denying Plaintiffs' motions for declaratory judgment and summary judgment and ruling that a trier of fact must determine whether Plaintiffs forfeited the Agreement through their issuance of a notice of intent to declare forfeiture and subsequent actions.  The state court order, fairly read, indicates that in 2009 the state court was presented with as muddled a factual record regarding corporate ownership and control as was this Court.

After Defendants' filed their bankruptcy petitions, Plaintiffs sought relief from the automatic stay in order to allow the state court to make such a determination regarding ownership at a December 10, 2009 hearing.  *See* 09-02782-TLM at Doc. No. 19; 09-02907-TLM at Doc. No. 15.  (Judicial notice is taken of the Court's files and records in the underlying chapter 7 cases. Fed. R. Evid. 201.)  The parties stipulated to stay relief in order for the state court to enter a
(continued...)

MEMORANDUM OF DECISION - 10

Regardless of who – if anyone – owned the stock, Cox and Richardson began to operate Design Air upon execution of the Agreement. Cox and Richardson caused Design Air to issue $40,000.00 checks to Brian and Ken Depue from the U.S. Bank line of credit for tax purposes, leaving an approximately $380,000 balance on that credit facility. Cox and Richardson modeled their management style after Plaintiffs' prior management of Design Air. They continued to expend funds to update equipment, solicit business and maintain employee moral. They drew a salary, authorized payments to Plaintiffs, and authorized additional distributions to themselves equal to their payments to Plaintiffs. *See* Ex. 129.

After the Agreement was signed, Design Air continued to lease its business premises from K&B Properties, ultimately converting to a month to month lease. Ex. 106. However, in June 2007, Cox and Richardson caused Design Air to

---

[12] (...continued)

"declaratory decision as to which party owns the common stock of the company Design Air, Inc." Case No. 09-02782-TLM at Doc. No. 28 (Order, Jan. 4, 2010); 09-02907-TLM at Doc. No. 24 (Order, Dec. 31, 2009); *see also* Case No. 09-02782-TLM, Doc. No. 23 at 2 (stipulation); 09-02907-TLM, Doc. No. 19 at 2 (stipulation). (The parties delayed submitting orders on these stipulations until after the December state court hearing had actually occurred).

The state court then entered its January 2010 judgment. Ex. 117. This judgment, at 3, suggests that additional evidence – *i.e.*, "new and additional facts presented by the Plaintiffs" – was relied upon by the state court to "resolv[e] the disputed factual issue set forth in [the court's] June 8, 2009, Order." However, the recitals in the judgment also indicate that Cox and Richardson failed to appear or defend (at the December 2009 hearing presumably) and that the January 2010 judgment was in the nature of default relief. Ex. 117 at 2. What weight to give the ruling is therefore questionable. *See generally Gamble v. Overton (In re Overton)*, 09.1 I.B.C.R. 19, 2009 WL 512159, at *3-5 (Bankr. D. Idaho 2009) (addressing principles of issue preclusion); *Catmull v. Vierra (In re Vierra)*, 08.2 I.B.C.R. 56, 59-60, 2008 WL 695027 (Bankr. D. Idaho 2008) (same).

MEMORANDUM OF DECISION - 11

purchase other real property and put a down payment on a building. Ex. 108. The

ultimate goal was to place a building on the land, move Design Air's operations

there, and no longer lease its business property from K&B Properties. Design Air

used the U.S. Bank line of credit to make the down payments on the land and

building.

Despite the source of the down payments, Design Air financed the land

purchase through Bank of the Cascades on a short-term loan. Exs. 108; 237. Cox

and Richardson planned for Design Air to obtain a construction loan and

permanent financing, rolling in the building costs and recouping the funds from

the U.S. Bank line of credit used for the down payments. They worked with Bank

of the Cascades, which in turn worked with a company called Capital Matrix, to

structure the construction loan and provide long-term financing. Unfortunately,

they were never able to complete this loan process. Difficulties arose regarding

financial paperwork, zoning, easements and grading issues which prevented

construction of the building. Cox and Richardson sought and received several

extensions on the Bank of the Cascades' short-term loan, but it ultimately matured

on July 19, 2008. Ex. 131.

Soon thereafter, in late August 2008, Bank of the Cascades "termed out" the

short-term loan and created a modified, short-term loan due August 15, 2010. *See*

Ex. 237 at 319-21. While the documents in evidence are not signed and do not

MEMORANDUM OF DECISION - 12

show they were recorded, Cox testified that Design Air completed this transaction.
In addition, Design Air's books show it paid the $3,847.60 closing costs associated
with the same.  *See* Ex. 110.

As noted, Design Air continued to utilize the U.S. Bank line of credit after
the Agreement was executed.  Design Air's secretary and bookkeeper, Melissa
Smith (formerly Melissa Mark) submitted monthly financial information to U.S.
Bank.  Besides reviewing these monthly reports, U.S. Bank conducted annual
reviews and required the line of credit guarantees to be signed annually.  Plaintiffs,
Cox and Richardson re-signed as guarantors on Design Air's line of credit with
U.S. Bank in July, 2007.  Ex. 140.  Neither U.S. Bank, nor Plaintiffs, were aware
of the land purchase which had been completed days before those guarantees were
signed.  Roger Wright, a commercial banker with U.S. Bank, testified that the
disclosure of the land purchase may not have altered U.S. Bank's willingness to
continue the line of credit, but that further review would have been required.

In December 2007, Mrs. Smith reclassified the land expenditures in Design
Air's Quickbooks as loans to a company called Hammer & Magnum, LLC
("H&M").  *See* Ex. 110.  She did so based on Design Air's accountant's
instructions.  However, Cox and Richardson had not yet formed H&M when this
reclassification occurred and, while they had discussed the entity structure with
their accountant, they credibly testified they were not prepared to transfer the

MEMORANDUM OF DECISION - 13

property to H&M at that time.  Indeed, the transfer never occurred.  H&M, which was formed in January 2008, never owned anything nor did it operate a business.  Any documents purporting otherwise were prepared in error.

Brian Depue learned of and informed U.S. Bank about Design Air's land purchase in 2008, and U.S. Bank required Cox and Richardson to include the land and the associated obligation on their 2008 financial disclosures.  However, in 2008 there were other issues with the line of credit, including Mr. Wright's concern that it was not being adequately paid down.  Plaintiffs were also concerned and ultimately refused to re-sign their guarantees on the line of credit in mid–2008.

In July 2008, Design Air provided various proposals to U.S. Bank of ways to pay down the line of credit, including forbearance of payments to Plaintiffs and use of funds from the Bank of the Cascade's construction loan, which Cox and Richardson still hoped Design Air would obtain.  Cox and Richardson also discussed delayed payments with Brian.  Design Air ultimately stopped paying Plaintiffs as of August 2008.

In late September 2008, Plaintiffs sent Cox and Richardson a notice of intent to declare forfeiture.  Ex. 229.  The forfeiture notice informed Cox and Richardson that "if said delinquent payments . . . are not paid within thirty (30) days from the date of service of this notice to you, [Plaintiffs] do elect to declare

MEMORANDUM OF DECISION - 14

said Agreement referred to herein null and void and all sums heretofore paid

forfeited to Seller as liquidated damages, and said Contract canceled."  In October,

Cox and Richardson met again with Brian and informed him they would not

contest the forfeiture and Plaintiffs should "take back the company."

Cox and Richardson were unable to contact Brian after the October

meeting.  They ultimately signed extensions on the U.S. Bank line of credit in

November 2008, but informed Mr. Wright of the forfeiture notice and that

Plaintiffs would be taking back Design Air.  Cox and Richardson signed the

November extension to preserve the line of credit in order to allow Plaintiffs to

operate Design Air's business.

On December 3, 2008, Cox and Richardson tendered their resignations.

Exs. 115, 116.  Plaintiffs did not resume Design Air's business.  U.S. Bank sent

the Design Air account to its special asset group and initiated a lawsuit against

Design Air and the guarantors on the line of credit.  Cox and Richardson filed

their chapter 7 bankruptcy petitions in September 2009.  On January 28, 2011, a

$350,000.00 stipulated judgment was entered in state court in favor of U.S. Bank

against Plaintiffs and K&B Properties.  Ex. 119.

## DISCUSSION AND DISPOSITION

### A.    Plaintiffs' abandoned causes of action

In their Amended Complaints, Plaintiffs claimed that debts owed to them

MEMORANDUM OF DECISION - 15

by Cox and the Richardsons should be held nondischargeable under § 523(a)(4)

and § 523(a)(6).  *See* Amended Complaint, Counts II and III.  At the

commencement of trial, Plaintiffs announced they would not pursue these causes.

In doing so, and at the same time, Plaintiffs also abandoned any claims under

Count V of the Amended Complaint.

### B.    Claims under § 523(a)(2)

Plaintiffs continue to pursue their claims under § 523(a)(2)(A) and (B).  To

prevail on a claim under § 523(a)(2)(A), a creditor must establish five elements by

a preponderance of the evidence:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the
> debtor; (2) knowledge of the falsity or deceptiveness of his statement
> or conduct; (3) an intent to deceive; (4) justifiable reliance by the
> creditor on the debtor's statement or conduct; and (5) damage to the
> creditor proximately caused by its reliance on the debtor's statement or
> conduct.

*Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1246 (9th Cir. 2001) (quoting

*Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d

1081, 1085 (9th Cir. 2000)).

The elements for a claim under § 523(a)(2)(B) are similar but not identical

to those for claims under § 523(a)(2)(A).[13]  To prevail on a claim under

§ 523(a)(2)(B), a creditor must show by a preponderance of the evidence (1) a

---

[13]   Indeed, § 523(a)(2)(A) and (a)(2)(B) target different conduct and are thus mutually
exclusive.  *Bank of Idaho v. Goodrich (In re Goodrich)*, 04.4 I.B.C.R. 166, 170 (Bankr. D. Idaho
2004) (citing *Tallant v. Kaufman (In re Tallant)*, 218 B.R. 58, 64 n.10 (9th Cir. BAP 1998)).

MEMORANDUM OF DECISION - 16

written representation of fact by the debtor concerning his or an insider's financial

condition, (2) that was material, (3) that the debtor knew at the time to be false, (4)

that was made with the intention of deceiving the creditor, (5) upon which the

creditor reasonably relied, and (6) that proximately resulted in damage to the

creditor. *Optekar v. Tickemyer (In re Tickemyer)*, 2011 WL 1230326, at *3

(Bankr. D. Idaho Mar. 31, 2011) (citing *Candland v. Ins. Co. of N. Am. (In re

Candland)*, 90 F.3d 1466, 1469 (9th Cir. 1996) (other citations omitted)).

## 1.    Subrogation

The Court first addresses Plaintiffs' subrogation arguments because, in

significant part, Plaintiffs do not rely upon representations directly made *to them*

by Cox or Richardson that were false or deceptive and which otherwise meet the

requirements of § 523(a)(2).  Plaintiffs argue, however, that they have "standing"

to raise a claim under § 523(a)(2)(A) and (B) based on representations Cox and

Richardson made *to U.S. Bank*.  They do so on a theory that involves the

following elements: (1) Design Air owed debts to U.S. Bank; (2) Plaintiffs

guaranteed those Design Air debts to U.S. Bank; (3) the parties understood that

U.S. Bank controlled the decision as to whether to release Plaintiffs from those

guarantees; (4) Cox and Richardson would "see that no later than May 1, 2008,

[Plaintiffs] are released from personal liability on the personal guarantees that

were given to U.S. Bank" under the Agreement; (5) the Agreement provided that

Design Air would continue to pay the U.S. Bank obligations and hold Plaintiffs

MEMORANDUM OF DECISION - 17

harmless from the same; (6) Cox and Richardson personally guaranteed Design Air's performance of the Agreement; (7) Cox and Richardson made false representations to U.S. Bank; and (8) U.S. Bank not only did not agree to release the guarantees of Plaintiffs, it eventually sued Plaintiffs for Design Air's default on the underlying note and line of credit and obtained a $350,000 judgment.

From these factors, Plaintiffs argue U.S. Bank would have a fraud claim against Cox and Richardson and that, by reason of Plaintiffs' liability to U.S. Bank, Plaintiffs are "subrogated" to U.S. Bank's rights to pursue a § 523(a)(2) determination. The Court disagrees. It concludes Plaintiffs have failed to establish they can maintain a § 523(a)(2) claim based on alleged misrepresentations made not to them but to a third party.

Plaintiffs' subrogation theory first relies on the "subrogation rights allowed in the US Bank Continuing Guarantee that all parties signed." Adv. No. 09-6092 at Doc. No. 91 at 2; Case No. 09-02907 at Doc. No. 46 at 2 ("Supplemental Brief").[14] However, Plaintiffs have not pointed to the language in the guarantees that they believe to be material to this point.[15]

_____

[14] Plaintiffs identified no such document(s) in their initial pretrial evidence disclosures. However, Defendants introduced Ex. 239 at trial purporting to be the U.S. Bank documents. Among the multiple documents in that exhibit are copies of guarantee agreements to U.S. Bank bearing the typewritten names of Brian Depue, Ken Depue, Cox, and Richardson. None of these documents are signed. Only during trial did Plaintiffs mark and introduce signed copies of the guarantees. *See* Ex. 140.

[15] The guarantees do note in paragraph 3 that "The Guarantor agrees that any right of subrogation as to payment or enforcement of any security interest securing the Obligations *shall*
(continued...)

MEMORANDUM OF DECISION - 18

Plaintiffs next rely on "state and bankruptcy case law" and assert the same supports their right to "equitable subrogation" and their ability to advance fraud claims that might be held by U.S. Bank against Defendants.  Supplemental Brief at 2.  Plaintiffs cite to this Court's decision in *In re A.D.S.T., Inc.*, 169 B.R. 64 (Bankr. D. Idaho 1994).  Supplemental Brief at 2-3.  That case established that one who claims to be equitably subrogated must satisfy certain prerequisites:

> (1) payment must be made pursuant to an obligation to do so, or in order to protect the subrogee's own interest, *i.e.*, the subrogee must not be making the payment as a mere "volunteer."; (2) the debt paid must be one for which the subrogee was not primarily liable; and (3) the entire debt must be paid.  Finally, (4) the subrogation must not work any injustice to the rights of others.

169 B.R. at 66.

Assuming that any payment by Plaintiffs under the unreleased guaranties of Brian and Ken Depue to U.S. Bank will satisfy the first factor (*i.e.*, the existence of an obligation, and payment to satisfy the same rather than as volunteer), and assuming that their guarantee liability is secondary and not primary, satisfying the second factor, the argument falters under the evidence on the third factor.  Here, a stipulated judgment was entered in favor of U.S. Bank and against the Depues and K&B Properties.  Ex. 119 (Judgment filed Jan. 31,

---

[15] (...continued)
*not be enforceable by any Guarantor until the Bank is paid in full.*"  Ex. 140 (emphasis added).
This requirement also appears under the case law and is discussed further below.

MEMORANDUM OF DECISION - 19

2011).[16]  But while that judgment establishes a joint and several $350,000 liability

of Plaintiffs and K&B Properties to U.S. Bank, there was no evidence that

Plaintiffs – as joint and several judgment defendants with K&B – paid any of this

debt.[17]  As *A.D.S.T.* notes, one element is that "the *entire* debt must be paid."  169

B.R. at 66 (emphasis added).[18]

      Here, there is no evidence that the debt was paid, something this Court has

held is a prerequisite to the maintenance of a subrogation claim.  This leads to the

conclusion that the right of subrogation that is attempted to be utilized here is

contingent and inchoate; it could arise and exist only on the happening of a future

event.  It therefore provides no basis for the present maintenance of this action.[19]

      The Court concludes that Plaintiffs have not established they may properly

---

[16]  The stipulated state court judgment against Plaintiffs and K&B Properties was entered after Defendants filed their bankruptcy petition and after these adversaries were commenced.  No state court judgment was ever entered adjudicating Defendants' liability to U.S. Bank.  Instead, Cox and Richardson's liability to U.S. Bank arises strictly from the guarantees as listed in their bankruptcy petitions.

[17]  Plaintiffs' Supplemental Brief suggests they are "currently liquidating property to pay for the debt."  Supplemental Brief at 3.  This, of course, is untrue.  And even if it were evidence, it would not establish the *A.D.S.T.* "prerequisite" of full payment.

[18]  As mentioned above at note 15, the U.S. Bank documents also make the guarantor's right of subrogation unenforceable until full payment has occurred.

[19]  To overcome this problem, Plaintiffs rely on *Aviva Life Ins. Co. v. Burton (In re Burton)*, 2009 WL 537163 (Bankr. E.D. Tenn. Feb. 20, 2009).  However, while this Court respects the thoughtful decisions of its fellow bankruptcy courts, such decisions are not binding on it.  *See generally In re DeBoer*, 99.3 I.B.C.R. 101, 1999 WL 33486710 (Bankr. D. Idaho 1999) (discussing stare decisis).  Moreover, the *Burton* decision is itself noted as "not intended for publication as the precedential effect is deemed limited," evidently a designation by the issuing court, not the reporter.  Perhaps for this reason *Burton* has never been cited by another court.  Finally, this Court sees some serious questions raised by the analysis in *Burton*, and is not persuaded by it.

MEMORANDUM OF DECISION - 20

use the rights of U.S. Bank (if any[20]) to obtain a judgment against Defendants

under § 523(a)(2).[21]

### 2.    Section 523(a)(2) claims against Heather Richardson

Heather was named as a defendant, and the Amended Complaint is not

specific in identifying which causes of action are directed to her.  Thus, the Court

is required to consider whether a claim has been adequately asserted against

Heather under § 523(a)(2).  *See Tickemyer*, 2011 WL 1230326, at *7-8 (citing

*Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa)*, 258 B.R. 192, 198 (9th Cir.

BAP 2001)).  There was no evidence whatsoever presented to establish Heather

took any action vis-á-vis Plaintiffs that would support such a claim.  The fact that

she was and is married to Richardson is alone insufficient.  "A marital union

alone, without a finding of a partnership or other agency relationship between

---

[20]  The Court has merely assumed for the purposes of the foregoing analysis that all the
several elements of § 523(a)(2)(A) and/or (B) could be established as to U.S. Bank.  To be clear,
it has not, need not, and does not reach that conclusion.

[21]  Given the headwind from the subrogation authorities, Plaintiffs tacked a different
legal course in their reply briefs, arguing their right to recover is based on a theory of
"exoneration" which would (in their view) not require their payment to U.S. Bank as a
prerequisite to relief.  While the Court, at the beginning of trial, denied Defendants' motion to
strike the subrogation argument, it noted that it did so based on the fact that Defendants were
alerted to the derivative nature of Plaintiffs' claim within the Amended Complaints and had
ample opportunity to discover facts and address the implied subrogation issue at trial and in
argument.  The same cannot be said as to Plaintiffs' newest theory.  Plaintiffs did not plead a
theory of exoneration in their Amended Complaints, did not raise it in their pre-trial briefs, and
did not argue it until their final reply briefs.  Plaintiffs note that "equitable subrogation" – which
they argue would include exoneration – should be "administered to ensure real and essential
justice without regard to form."  *Hoopes v. Hoopes*, 861 P.2d 88, 92 (Idaho Ct. App. 1993).
However, countenancing such trial tactics would not be equitable and justice would not be
served.  The Court will not consider Plaintiffs' newest legal argument given when and how it was
presented and Defendants' inability to respond.

MEMORANDUM OF DECISION - 21

spouses, cannot serve as a basis for imputing fraud from one spouse to the other."
*Tickemyer*, 2011 WL 1230326 at *7 (citations omitted).

As there is no proof of any activity by Heather with or directed toward
Plaintiffs, the § 523(a)(2) cause in the Amended Complaint as against Heather will
be dismissed.[22]

### 3. Section 523(a)(2) claims against Cox and Richardson other than on subrogation

Plaintiffs do not rely solely on the fraud claims that flow through
misrepresentations allegedly made to U.S. Bank. There are some claims against
Cox and Richardson under § 523(a)(2)(A)[23] which are premised on alleged
misrepresentations from Cox and Richardson directly to Plaintiffs.

### a. Promissory fraud

Plaintiffs contend Cox and Richardson falsely promised to perform their
obligations under the Agreement, including their intention and agreement to obtain
release of Plaintiffs from the U.S. Bank guarantees. This Court has recognized
that there is a "subset of § 523(a)(2)(A) authority that validates

---

[22] The Court will consider *infra* the § 727(a) claims that run against both the Richardsons.

[23] The Court concludes there are no cognizable § 523(a)(2)(B) claims of Plaintiffs against Cox and Richardson. Under the evidence, the sole written representations of financial condition were those made by Cox and Richardson to U.S. Bank, and they are not actionable by Plaintiffs given the rejection of the subrogation theory, *supra*. No evidence of written representations *to Plaintiffs* by Cox or Richardson regarding their financial condition was ever presented.

MEMORANDUM OF DECISION - 22

nondischargeability actions for 'promissory fraud.'  These cases require proof that
at the time the promise was made, it was then known to the maker to be false and
that there was no intent or ability to perform the promise." *Fetty v. Carlson (In re
Carlson)*, 426 B.R. 840, 854 n.18 (Bankr. D. Idaho 2010) (citations omitted).  In
closely evaluating the entirety of the evidence, the Court finds an absence of proof
as to the elements of falsity, knowledge of falsity, and intent required to sustain
such a contention.  Plaintiffs' Amended Complaint in this regard will be
dismissed.

### b.    "Misuse" of corporate assets

Plaintiffs argue in various, and at times abstruse, manners that the way in
which Cox and Richardson ran the Design Air business after the Agreement was
reached constitute misrepresentations or fraudulent omissions or other "deceptive"
conduct.  They point to things such as incurring expenses to take employees to
Canada for "training" classes; purchasing computers; using the U.S. Bank line of
credit to fund "personal" expenses ranging from expenditures at a Nevada "strip
club" to purchasing guns and plane tickets; making excessive expenditures on two
new pickup trucks; and making the down payment on real estate prospectively to
be used, through a lease from H&M, as Design Air's business premises.  The
problems with these allegations are several.

First, many of the challenged transactions or expenses were adequately
explained by Cox and Richardson.  For example, Cox and Richardson explained

MEMORANDUM OF DECISION - 23

the Nevada expenses fell under ordinary (for their business at least) "travel and entertainment," as they were entertaining customers and vendors at such venues in pursuit and furtherance of those individuals' business with Design Air.[24]  The computers and training classes were likewise explained as needed to familiarize staff with new HVAC technologies.  A plane ticket that Plaintiffs suggested was for someone in a personal relationship with one of the Defendants was, under the testimony, for a corporate employee and a business-related trip.  The pickups were justified by Cox and Richardson as a business expense even though a more conservative approach may have led them to use other vehicles already owned by the corporation.  While Plaintiffs may not feel totally satisfied with these explanations, they did not provide a basis for the Court to ignore them.

Secondly, these were not "representations" made to Plaintiffs, nor if they were was it shown that they were knowingly false.  Nor was it proven that they were made with an intent to induce Plaintiffs' reliance and consequent injury.  In short, Plaintiffs clearly did not like the way Cox and Richardson ran the business. But that does not make the various matters highlighted by Plaintiffs the basis of § 523(a)(2)(A) causes of action.

Plaintiffs bore the burden of proving all the § 523(a)(2)(A) elements by a preponderance of the evidence, and they have failed to do so on these claims.

---

[24]  Plaintiffs did not challenge this explanation, much less impeach it.

MEMORANDUM OF DECISION - 24

### c.    Land purchase

Cox and Richardson caused funds to be obtained through the Design Air line of credit with U.S. Bank and used those funds to make a down payment on the purchase of real property.  Cox and Richardson testified that they had anticipated developing the property into a business site for Design Air, and that they would lease it to Design Air much as Plaintiffs had been doing in leasing business premises to the corporation through their entity K&B Properties.  They indicated further that this acquisition had several purposes.  For example, it was part of Cox and Richardson's attempts to model their financial affairs after Plaintiffs' successful business relationship between K&B Properties and Design Air. Additionally, Cox and Richardson testified that this was part of their effort to build their financial net worth and, hopefully, allow them to obtain the release of Plaintiffs from the U.S. Bank guarantees, as they were obligated to do under the Agreement.[25]

Their handling of this transaction and their efforts to effectuate the expressed intent were marked by confusion and sloppiness.  Cox and Richardson, using an accountant for advice and counsel, decided to form a limited liability company, H&M, to hold the property.  The evidence suggests this entity was not

---

[25]  Not only did Cox and Richardson testify regarding their understanding of what would be required to obtain the release, Mr. Wright acknowledged Cox and Richardson's business experience and financial condition had to be stronger in order to obtain Plaintiffs' release from their guarantees.

MEMORANDUM OF DECISION - 25

timely and perhaps not properly formed; that the real property was held in Design

Air's name and never transferred to H&M; that tax returns related to H&M were

inaccurate; and that there were other problems in the accomplishment of what Cox

and Richardson indicated was their design and intent.  Cox and Richardson

admitted many of the errors, and pointed to confusion between them, their

accountant, and the staff at Design Air handling the various documents involved

and the corporate financial books.

The problem, once again, is that there were no representations made by Cox

and Richardson to Plaintiffs in connection with the use of the Design Air line of

credit for this purpose.  After the execution of the Agreement, Cox and Richardson

were the individuals operating Design Air, as officers and as the business'

practical managers.  They had the authority to borrow money and expend funds.

They violated no contractual covenant in doing so.[26]  If a bad decision (even

though one allegedly modeled after Plaintiffs' own approach) was made, it was

only that – a bad business decision.[27]

---

[26]  The Agreement contains no prohibition against Design Air purchasing land or
operating its business on a site other than the one owned by K&B, nor were there any restrictions
on Cox and Richardson forming other entities, such as H&M, which may do business with
Design Air so long as the other entities didn't compete with Plaintiffs' fireplace, stove, security
system and central vacuum system business.

[27]  Plaintiffs argue that the use of the line of credit for this purpose was not properly
disclosed to, and arguably concealed from, U.S. Bank.  However, the Court has already rejected
the theory of derivative fraud or similar action based on Plaintiffs' attempted subrogation to the

(continued...)

MEMORANDUM OF DECISION - 26

In briefing, Plaintiffs assert that when they raised specific questions about certain expenditures, Cox and Richardson lied.  But briefing is not evidence. Plaintiffs failed to prove, through testimony at trial, such express verbal representations, when they were made, their falsity, Defendants' intent, Plaintiffs' justifiable reliance, and proximate damages stemming from those representations.

In conclusion, the Court finds Plaintiffs failed to establish, by a preponderance of the evidence, all the requisite elements of a nondischargeable debt under § 523(a)(2).

## D.    Claims under § 727(a)

A denial of discharge under § 727(a) is one of the most severe sanctions this Court can impose.  As such, the statutory requirements are strictly construed against the objecting creditor and in favor of the debtor.  *Petro Concepts, Inc. v. Mundt (In re Mundt)*, 10.1 I.B.C.R. 8, 12, 2009 WL 5386131, *7 (Bankr. D. Idaho 2009).  The burden is on the creditor to provide proof, by a preponderance of the evidence, that a debtor's discharge should be denied.  *Id.* (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991)).

Plaintiffs' Amended Complaints alleged causes of action under § 727(a)(2), (3), (4) and (7) in Count IV.  In their closing briefs, Plaintiffs restricted their focus

---

[27] (...continued)
rights of U.S. Bank.

MEMORANDUM OF DECISION - 27

solely to § 727(a)(3) and § 727(a)(4)(A).  The Court will do the same.[28]

### 1.    Section 727(a)(3)

Section 727(a)(3) provides that a debtor may receive a discharge "unless . . .
the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or
preserve any recorded information, including books, documents, records, and
papers, from which the debtor's financial condition or business transactions might
be ascertained, unless such act or failure to act was justified under all of the
circumstances of the case[.]"

In order to sustain a claim under § 727(a)(3), Plaintiffs must show by a
preponderance of the evidence "(1) that the debtor failed to maintain and preserve
adequate records, and (2) that such failure makes it impossible to ascertain the
debtor's financial condition and material business transactions." *Mundt*, 10.1
I.B.C.R. at 14.

Plaintiffs focus on Defendants' alleged failure to properly complete their
Statement of Financial Affairs ("SOFA").  They also focus on Defendants' failure
to list accounts receivable in their schedules, or to file taxes in 2008.  However, a
failure to properly complete their schedules or SOFA does not address the inquiry

---

[28]   Because Plaintiffs failed to argue and advance their § 727(a)(2) and (7) causes of
action, the Court deems them abandoned.  Moreover, even if Plaintiffs did not abandon those
causes, the Court finds they did not satisfy their burden to prove the requisite elements to support
entry of judgment under either § 727(a)(2) or (7).

MEMORANDUM OF DECISION - 28

required under § 727(a)(3) which is on the maintenance of adequate business

records.  In order to deny Defendants a discharge under § 727(a)(3), Plaintiffs

must prove Defendants failed to maintain and preserve adequate records from

which their financial condition and business transactions could be ascertained, not

that they may have erred in completing their schedules or SOFAs.

Here, the Court is unaware of which records Cox and Richardson[29] failed to

maintain and produce.  Plaintiffs point to Defendants' assertion in their SOFAs

that they did not possess business records for Design Air[30] and H&M, but

Plaintiffs failed to specify the nature of the financial records they requested from

Cox and Richardson, the records Plaintiffs received, or the missing records or

information needed to trace the financial dealings of those companies.

The evidence shows Cox and Richardson used Quickbooks in Design Air's

operations, and that they left those records with the corporation when they

resigned, in part because they believed they had no ownership interest in Design

---

[29]  Plaintiffs failed to establish a § 727(a)(3) cause against Heather Richardson.  As the Ninth Circuit Court of Appeals noted in *Cox v. Lansdowne (In re Cox)*, 904 F.2d 1399 (9th Cir. 1990), when a wife is inextricably involved in her husband's business ventures, she shares the duty to keep adequate records and a failure to keep such records leaves her susceptible to denial of discharge under § 727(a)(3).  Here, however, Plaintiffs provided no evidence at all as to Heather's involvement with those businesses and, thus, no evidence to demonstrate such a duty arose as to Heather.  The cause is dismissed as to her.

[30]  Of course, by the time of the bankruptcies and SOFAs, Cox and Richardson had resigned their corporate positions and returned Design Air to Plaintiffs.  That they would not thereafter "possess" Design Air records is not inconsistent with the evidence or illogical.

MEMORANDUM OF DECISION - 29

Air. Such records were left on the property leased by Design Air and owned by

K&B Properties, and Plaintiffs had access to those records. Indeed, several

Design Air ledgers were admitted into evidence. While not the model of clarity,

financial records were maintained and evidence was submitted to the Court

adequately detailing Cox and Richardson's business transactions with regard to

Design Air.[31]

As to separate H&M records, Cox and Richardson testified that H&M

never operated as a business. It did not own any property or have any accounts.

While no records were maintained for this entity, the lack of records was justified

given that entity's lack of operation.

Based on the evidence presented, the Court finds Plaintiffs have failed to

meet their burden under § 727(a)(3) and that cause of action will be dismissed.

### 2.    Section 727(a)(4)

Plaintiffs argue Defendants' discharge should be denied under § 727(a)(4).

Section 727(a)(4)(A) states: "The court shall grant the debtor a
discharge, unless ... the debtor knowingly and fraudulently, in or in
connection with the case[,] made a false oath or account." 11 U.S.C. §
727(a)(4)(A). "A false statement or an omission in the debtor's
bankruptcy schedules or statement of financial affairs can constitute a

---

[31]   As previously noted, the land acquisition and the references to H&M within the
Design Air books were confusing and sloppy, but they were also explained by Richardson. The
errors stemmed from confusion between Cox and Richardson, their accountant, and the secretarial
staff at Design Air handling the various documents. While convoluted, the financial transactions
regarding the land can be traced.

MEMORANDUM OF DECISION - 30

false oath." *In re Khalil*, 379 B.R. at 172. "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations." *Id.* (quoting *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 63 (B.A.P. 9th Cir. 1999)).

To prevail on this claim, a plaintiff must show, by a preponderance of the evidence, that: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (B.A.P. 9th Cir. 2005) (citing *In re Wills*, 243 B.R. at 62). A finding of fraudulent intent is a finding of fact reviewed for clear error. *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986).

*Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196-97 (9th Cir. 2010) (footnote omitted). Plaintiffs point to a host of asserted omissions and errors in Debtors' schedules and SOFAs to support their cause of action.[32] However, Plaintiffs have not proven those errors or omissions were material or detrimentally impacted the administration of the estate.[33]

Even assuming some of the asserted errors or omissions could be

---

[32] Plaintiffs also assert grounds based on actions that appear totally unrelated to this case or to § 727(a), such as Cox and Richardson's allegedly improper application for unemployment benefits. The same are legally insufficient and are ignored.

[33] Indeed, several of the asserted errors and omissions were not even errors or improper omissions. For example, Plaintiffs argue Defendants should have identified in the SOFAs the repossession of vehicles belonging to Design Air, and that they should have listed in their schedules accounts receivable belonging to Design Air. Even if the Court were to assume Cox and Richardson owned Design Air, the identified assets did not belong to Cox and Richardson personally and would properly be excluded from their schedules. *See In re Young*, 409 B.R. 508, 513 (Bankr. D. Idaho 2009) (noting that a bankruptcy petition filed by the owner of a business brings into the bankruptcy only that individual's ownership interest, not the corporation's assets).

MEMORANDUM OF DECISION - 31

considered material, Plaintiffs have not proven Defendants had the requisite

fraudulent intent to deceive their creditors when completing their schedules and

excluding the specified information.  In order to demonstrate fraudulent intent,

Plaintiffs must show that the Defendants: "made them with the *intention and*

*purpose of deceiving the creditors*." *In re Khalil*, 379 B.R. 163, 173 (9th Cir. BAP

2007) (quoting *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 884 (9th Cir.

BAP 2005) (alterations in original)); *see also Retz*, 606 F.3d at 1198-99 (noting

that a reckless disregard of the truth may be circumstantial evidence of intent, but

is not sufficient, alone, to prove fraudulent intent).  In reviewing the evidence and

weighing the credibility of Cox and Richardson, the Court concludes that while

the schedules and SOFAs were not filled out with precision, they were also not

shown to have been filled out with an intent to deceive creditors.

Plaintiffs' cause of action under § 727(a)(4) will be dismissed.

### E.    Defendants' Counterclaims

Defendants' Counterclaims against Plaintiffs allege fraud and defamation.

Defendants abandoned their defamation counterclaim at the conclusion of trial.

The fraud counterclaim pends.

Plaintiffs argue there are jurisdictional or similar problems with this Court

MEMORANDUM OF DECISION - 32

hearing and adjudicating these counterclaims.[34]  There is, however, another problem which is outcome determinative.

Defendants' Counterclaims, through which they seek monetary damages for Plaintiffs' alleged fraud, arise from what Defendants see as Plaintiffs' misrepresentations regarding the value of Design Air in 2006 as Defendants were negotiating and entering into the Agreement.  Cox and Richardson filed bankruptcy in 2009.  Legal claims and causes of action held by a debtor which existed at the time the debtor's bankruptcy case was filed become property of the estate.  *See* § 541(a).[35]  *See also City & County of San Francisco v. PG&E Corp.,* 433 F.3d 1115, 1126 (9th Cir. 2006); *Sierra Switchboard Co. v. Westinghouse Elec. Corp.*, 789 F.2d 705, 708 (9th Cir. 1986).  Cox and Richardson's rights of action to collect damages for such alleged fraud are prepetition assets and, thus, property of their respective bankruptcy estates.  This property of the estate has never been abandoned, and only the Trustee in each case has the right and ability to sue for recovery.  *See In re Spirtos v. One San Bernardino Cnty. Superior Ct.*, 443 F.3d 1172, 1175 (9th Cir. 2006) (citing *Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268, 1272 (11th Cir. 2004) ("[A] trustee, as the representative of the bankruptcy estate, is the proper party in interest, and is the only party with standing to

---

[34]  Plaintiffs assert additional defenses as well.

[35]  Section 541(a)(1) states, "[t]he commencement of a case [under the Bankruptcy Code] creates an estate . . . comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case."

MEMORANDUM OF DECISION - 33

prosecute causes of action belonging to the estate.").  It is, in short, a question of standing, and the Court finds Cox and Richardson lack the standing to assert these claims.  Defendants' remaining Counterclaims will therefore be dismissed.

**CONCLUSION**

Based upon the foregoing findings and conclusions, Plaintiffs' Amended Complaints against Defendants under § 523 and § 727 will be dismissed.  In addition, Defendants' Counterclaims will also be dismissed.  The Court concludes Defendants are the prevailing parties and will be awarded costs.[36]  The Court will enter a Judgment consistent with this Decision.

DATED:  November 10, 2011



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

---

[36]  Both parties requested an award of attorneys' fees under state law.  Those requests are denied, and no fees will be awarded to either party.

MEMORANDUM OF DECISION - 34